UNITED STATES DISTRICT COURT
<u>NORTHERN DISTRICT OF NEW YORK</u>

STEPHANIE GILMORE,

                    Plaintiff,

-against-                                 1:19-CV-888 (LEK/CFH)

SARATOGA CENTER FOR CARE, LLC and
DANIELLE ZASTAWNY,

                    Defendants.

---

## <u>MEMORANDUM-DECISION AND ORDER</u>

## I.    INTRODUCTION

On July 23, 2019, pro se Plaintiff Stephanie Gilmore commenced this action against Defendants Saratoga Center for Care, LLC ("Saratoga Center") and Saratoga Center's administrator, Danielle Zastawny, for alleged wrongdoing at the Saratoga Center for Rehabilitation and Skilled Nursing Care (the "Facility"). Dkt. No. 1 ("Complaint"). On September 28, 2023, Defendants moved for judgment on the pleadings. Dkt. No. 61-3. ("Motion"). Plaintiff filed a response, Dkt. No. 63 ("Response"), and Defendants filed a reply, Dkt. No. 64. Plaintiff then filed a surreply. Dkt. No. 65.[1]

For the reasons that follow, Defendants' Motion is granted in part and denied in part.

## II.    BACKGROUND

### A.  Plaintiff's Work at the Facility

The following facts are set forth as alleged in the Complaint. From June 2018 to April 2019, Plaintiff worked as a registered nurse supervisor at the Saratoga Center for Rehabilitation

---

[1] Under Local Rule 7.1(a)(1), "[u]nless otherwise ordered by the Court . . . . [a] surreply is not permitted." Plaintiff did not seek, and the Court did not grant, permission to file a surreply. Accordingly, it will not be considered.

and Skilled Nursing Care, a nursing facility in Ballston Spa, New York. *Id.* at 1, 7.[2] Plaintiff is

Black and of African/Haitian descent. *Id.* at 18, 19.

At the start of her employment, Plaintiff was "praised" on "many documented occasions"

for "keeping the resident[s] safe," despite the Facility being "severely understaffed." *Id.* at 7. She

worked "well over 80 hours" in two-week periods, often working double shifts while overseeing

two or three units. *Id.*

On August 3, 2018, Human Resources Director Kim Heroth left Plaintiff a voicemail

"accusing [Plaintiff] of violating [the Facility's] social media policies." *Id.* at 8. Plaintiff called

Heroth back with confusion, because Plaintiff did not have any social media accounts. *Id.* Heroth

"immediately attempted to apologize," and explained that the post was made by a white nurse

who shared Plaintiff's first name. *Id.* Heroth assumed that Plaintiff was the one who made the

post because Plaintiff "was just in [her] office." *Id.* Heroth said she was "used to people

becoming upset and irate." *Id.* Plaintiff "was very offended by her assumption as [Plaintiff] read

between the lines of what she really meant, that the people she was referring to [were] employees

of color." *Id.*

In October 2018, Plaintiff got into a disagreement with a white nurse manager and Danita

Wiley, a white evening supervisor, about when to take the temperatures of the residents prior to

administering the flu vaccine. *Id.* Ultimately, they "agreed to disagree." *Id.* Plaintiff later

overheard Wiley say, "[t]hat girl, she better had taken those temps." *Id.* at 9. Plaintiff reported

this to the Facility's director of nursing, and Wiley apologized. *Id.*

---

[2] Citations to Plaintiff's filings refer to the pagination generated by CM/ECF, the Court's
electronic filing system. Citations to Defendants' filings refer to the pagination on the pages
themselves.

On October 26, 2018, a resident of the Facility "got out" and "was missing for over two hours." *Id.* Plaintiff alleges that "[n]one of the[] protocols" were followed. *Id.* In particular, the Facility failed to take "an entire census count of the resident[s] in the building" or "thoroughly check[]" the doors on the perimeter of the Facility. *Id.* Further, the resident's family had not been notified of the incident. *Id.* This made Plaintiff "uncomfortable with the situation." *Id.* In a later meeting with the Facility's director of nursing, the Facility's assistant director of nursing, and the certified nursing assistant on duty, Plaintiff "stressed [her] disapproval of the fact that the [resident's] family ha[d] yet to be notified." *Id.* at 10. Eventually, the "relief supervisor" spoke with the resident's son, but only said, "Your dad got pas[t] our doors the alarms sounded and he was immediately redirected back inside." *Id.* Plaintiff witnessed this interaction and "made it up in [her] mind that [she] had a duty to report this situation to the [D]epartment of [H]ealth." *Id.* Plaintiff submitted an anonymous report on October 29, 2018,[3] which prompted an investigation. *Id.* Plaintiff was "made aware that due to the magnitude of the situation [her] name may have been released to the [F]acility in the course of the investigation." *Id.*

Plaintiff asserts that after this incident, "the harassment and sabotage began." *Id.* Following staffing changes, Plaintiff began to work more closely with Alyssa Stealy, a licensed practical nurse. *Id.* at 10–11. According to Plaintiff, Stealy and Zastawny were friends and had "outside ties." *Id.* at 17. Stealy was the babysitter for Zastawny's child. *Id.* at 11. According to Plaintiff, she and Alicia Olpaka, a white co-worker, "[w]ould often have to fix medication orders that [Stealy] would improperly put in the system." *Id.* Plaintiff states that Stealy "never took issue" with Olpaka's corrections of her errors, but she "would always have issue with

---

[3] The Complaint alleges that this report was submitted on October 29, 2019. Compl. at 10. The Court assumes this is an error and that Plaintiff meant October 29, 2018.

[Plaintiff]." *Id.* Stealy also "often made baseless comments" about Plaintiff. *Id.* Stealy "continued to attempt to sabotage [Plaintiff] and [her] night staff [who] all happen to be black." *Id.* The director of nursing eventually told Plaintiff that Stealy wanted Plaintiff to be terminated, and that Plaintiff should "try to stay out of her way." *Id.*

In early January 2019, Plaintiff was told by the Facility's scheduler that she "was no longer allowed on B1," one of the Facility's units. *Id.* at 12. After further inquiry by Plaintiff, the director of nursing told her that "a resident had made a complaint . . . and [Stealy] decided that [Plaintiff] was the recipient of that resident complaint . . . and had [Plaintiff] removed." *Id.* However, following an investigation into the matter, Plaintiff "was not even on duty the night in question." *Id.* Plaintiff returned to working on B1 "[a]bout two weeks later." *Id.*

In mid-January 2019, Stealy incorrectly told a resident's child that Plaintiff failed to document a progress note. *Id.* Stealy called Plaintiff "useless." *Id.* Immediately after, Plaintiff and Olpaka went to the office of Steve Millington, a white nurse manager. *Id.* at 12–13; s*ee id.* at 11. Olpaka told Millington that she is "tired of [Stealy] trying to sabotage [Plaintiff]" and "tired of listening to [Stealy] . . . ask [Zastawny] when is she going to fire those people, whose those people?" *Id.* at 13. Millington "assured" Olpaka and Plaintiff that "he would handle the situation," but "nothing was done." *Id.*

In February 2019, a resident complained to Zastawny that Plaintiff accused him of "purposely falling and hurting himself for insurance purposes." *Id.* When Zastawny addressed this complaint with Plaintiff, Plaintiff "reassured [Zastawny] that [she] would use better wording." *Id.* A few days later, the same resident "made a complaint stating that [Plaintiff] made [] rude comments to him." *Id.* at 14. However, Plaintiff "did not exchange words with [the resident] during the encounter." *Id.* Plaintiff told Zastawny that the "resident had something

against [her]," but Zastawny "refused to acknowledge that." *Id.* Plaintiff "continued to work on B1 . . . without incident." *Id.*

On February 26, 2019, Plaintiff grew concerned about a resident whose narcotics intake was increased by Millington. *Id.* The resident ultimately experienced a medical emergency. *Id.* at 14–15. Later, Plaintiff reported to the director of nursing her suspicion that Millington "had logged into the system from home and discontinued the narcotic that was increased." *Id.* at 15. Plaintiff told him that "it had to be reported" because nurses are "mandated reporters." *Id.* Plaintiff reported the incident to the Department of Health. *Id.*

The next day, February 27, 2019, Plaintiff received a voicemail from Zastawny, saying that "there were several resident complaints," and that Plaintiff should "not [] return to work until [Zastawny] speaks to [her]." *Id.* Plaintiff never spoke with Zastawny. *Id.*

On March 5, 2019, Plaintiff spoke with Heroth "to inquire about [her] employment status." *Id.* Heroth told her that she was unaware that Plaintiff was not working, and that she would check with Zastawny. *Id.*

On March 29, 2019, Plaintiff contacted the Facility again, and communicated with the new human resources director, Christina. *Id.* at 16. Heroth no longer worked for the Facility. *Id.* at 15. Christina told Plaintiff that she would "find out what's going on." *Id.* at 16. On April 3, 2019, Plaintiff was told that she was "all clear to return to work," and to meet with the new director of nursing, Bill Redmond. *Id.*

On April 8, 2019, Plaintiff met with Redmond, who "questioned [Plaintiff] on [her] thoughts on what the situation was." *Id.* Redmond then left the office to confer with Zastawny. *Id.* When he returned, Redmond told Plaintiff that "since we are an at-will state, we are terminating you." *Id.* After Plaintiff "asked for some clarification," Redmond said that Zastawny

5

"told him that she got a complaint from the resident that was previously documented making false accusations towards [Plaintiff]." *Id.* at 16–17. "The complaint was that [Plaintiff] alleged[ly] placed the medication cup . . . loudly on the table and that [Plaintiff] didn't smile." *Id.* at 17. On April 15, 2019, Plaintiff received a termination letter from the Facility. *Id.*

### B.  Plaintiff's Timeline of Filings

In early March 2019, Plaintiff filed a charge with the Equal Employment Opportunity Commission. Resp. at 1; Compl. at 21. In a letter dated March 27, 2019 ("EEOC Letter"), the EEOC acknowledged Plaintiff's allegations that she was "laid off because of [her] race," and "in retaliation for making a complaint to the Respondent," but nevertheless dismissed her claims. Resp. at 4. The EEOC also provided a Notice of Dismissal and Right to Sue ("Notice"), which granted Plaintiff the right to sue Defendants "within 90 days of [her] receipt of this notice." *Id.* at 5. Plaintiff states that she received the Notice from the EEOC on or about April 24, 2019. Compl. at 4; *see also* Resp. at 1.

On May 20, 2019, Plaintiff filed a complaint with the New York State Division of Human Rights ("NYSDHR"), alleging race discrimination and retaliation for reporting safety concerns. Dkt. No. 61-2 ("Exhibits") at 5–8, 13–24. After investigating the matter, the NYSDHR recommended a public hearing. Resp. at 9.

Plaintiff filed the Complaint in this action on July 23, 2019, presenting facts nearly identical to those investigated by the NYSDHR. *Compare* Compl. at 7–21 *with* Exs. at 8, 13–24.

On February 15, 2021, Plaintiff wrote to the NYSDHR Administrative Law Judge overseeing Plaintiff's complaint, requesting that her NYSDHR case be dismissed "so that [she] may pursue [her] complaint in federal court." Resp. at 19. The Administrative Law Judge provided Defendants with ten days to object to Plaintiff's request, noting that her request "will be

granted without opposition." *Id.* at 20. Plaintiff's NYSDHR complaint was subsequently

dismissed for administrative convenience. Mot. at 16.

In the Complaint, Plaintiff asserts claims arising under Title VII of the Civil Rights Act,

42 U.S.C. § 2000e, *et seq.* ("Title VII"),[4] the New York Whistleblower Law, N.Y. Lab. Law §

740 ("Section 740"), and the New York Health Care Whistleblower Law, N.Y. Lab. Law § 741

("Section 741"). *See* Compl. at 2, 19. Defendants seek judgment on the pleadings and dismissal

of the Complaint. Mot. at 31.

## III.    LEGAL STANDARD

The standard of review for a motion for judgment on the pleadings and that of a motion

to dismiss are indistinguishable. *LaFaro v. N.Y. Cardiothoracic Grp. PLLC*, 570 F.3d 471, 475

(2d Cir. 2009). Therefore, to survive a motion for judgment on the pleadings, "a complaint must

contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its

face." *Div. 1181 Amalgamated Transit Union-N.Y. Emps. Pension Fund v. N.Y.C. Dep't of

Educ.*, 9 F.4th 91, 94 (2d Cir. 2021) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). The

court must draw all inferences in favor of the plaintiff. *Id.* (citing *Austin v. Town of Farmington*,

826 F.3d 622, 625 (2d Cir. 2016)). A complaint may be dismissed only where it appears that

there are not "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic

Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Plausibility requires "enough fact[s] to raise a

reasonable expectation that discovery will reveal evidence of [the alleged misconduct]." *Id.* at

556. The plausibility standard "asks for more than a sheer possibility that a defendant has acted

unlawfully." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556). Where a court is unable

---

[4] On November 21, 2019, the Court dismissed Plaintiff's Title VII claims against Zastawny. Dkt. No. 5; *see also* Dkt. No. 4. Accordingly, the Court will assess Plaintiff's Title VII claims only against the Facility.

to infer more than the mere possibility of the alleged misconduct based on the pleading facts, the pleader has not demonstrated that she is entitled to relief and the action is subject to dismissal. *See id.* at 678–79.

Where, as here, a plaintiff proceeds pro se, the court must "construe the complaint broadly, and interpret it to raise the strongest arguments that it suggests." *Weixel v. Bd. of Educ. of City of N.Y.*, 287 F.3d 138, 146 (2d Cir. 2002) (cleaned up). Nevertheless, "dismissal of a pro se complaint is appropriate where a plaintiff has clearly failed to meet the minimum pleading requirements." *Rahman v. Schriro*, 22 F.Supp.3d 305, 310 (S.D.N.Y. 2014) (citing *Rodriguez v. Weprin*, 116 F.3d 62, 65 (2d Cir. 1997)). The Court's "duty to liberally construe a plaintiff's complaint is not the equivalent of a duty to re-write it." *Geldzahler v. N.Y. Med. Coll.*, 663 F. Supp. 2d 379, 387 (S.D.N.Y. 2009) (cleaned up).

## IV.    DISCUSSION

Defendants support their motion for judgment on the pleadings with several arguments. First, they argue that Plaintiff failed to exhaust her administrative remedies prior to filing the Complaint, and that her Complaint is not timely. Mot. at 12–15. Next, they argue that the election-of-remedies doctrine precludes the Court from hearing Plaintiff's claims. *Id.* at 15–20. Then, they argue that Plaintiff's Title VII claims against Saratoga Center fail on the merits. *Id.* at 20–28. Last, they argue that Plaintiff's state law claims fail on the merits, or in the alternative, that the Court should decline to exercise supplemental jurisdiction over them. *Id.* at 28–31. The Court considers each of Defendants' arguments in turn.

### A.  Exhaustion and Timeliness

Defendants contend that Plaintiff failed to exhaust her administrative remedies and that her Complaint is not timely. Mot. at 12–15. Their arguments are unconvincing.

First, Defendants argue that Plaintiff's Notice is invalid because it "cannot have been issued for the facts and occurrences out of which Plaintiff's Complaint arises." *Id.* at 13. The Second Circuit has held that "[b]efore bringing a Title VII suit in federal court, an individual must first present 'the claims forming the basis of such a suit . . . in a complaint to the EEOC or the equivalent state agency.'" *Littlejohn v. City of New York*, 795 F.3d 297, 322 (2d Cir. 2015) (quoting *Williams v. N.Y.C. Hous. Auth.*, 458 F.3d 67, 69 (2d Cir. 2006)). However, "claims not raised in an EEOC complaint may still be part of the complaint later filed in federal court 'if they are reasonably related to the claim filed with the agency.'" *Id.* (quoting *Williams*, 458 F.3d at 70). "A claim is reasonably related to the filed claim 'if the conduct complained of would fall within the scope of the EEOC investigation which can reasonably be expected to grow out of the charge that was made.'" *Id.* (quoting *Deravin v. Kerik*, 335 F.3d 195, 200–01 (2d Cir. 2003)).

Here, Defendants argue that because Plaintiff filed a complaint with the EEOC prior to her termination and almost two months before filing a complaint with the New York Division of Human Rights, it "could not have been issued by the Commission pursuant to an investigation of these underlying facts." Mot. at 13. The Court disagrees.

Plaintiff asserts that she filed the EEOC complaint in early March 2019. *See* Resp. at 1; Compl. at 21. Her final day working at the Facility was February 27, 2019. *Id.* at 15. The Court finds that an EEOC complaint filed just days after Plaintiff was told not to return to work could plausibly contain the facts alleged in the Complaint.

Further, in the EEOC Letter to Plaintiff, the EEOC acknowledges the very claims that Plaintiff asserts in the Complaint. *See* Resp. at 4. It notes that Plaintiff alleged that she was laid off because of her race and in retaliation for making a complaint. *Id.* Drawing all inferences in

favor of the Plaintiff, the EEOC appears to have investigated the facts underlying Plaintiff's Complaint.

To the extent that this Complaint may include underlying facts, and even additional claims, that arose after Plaintiff filed her EEOC complaint, the Court finds them to be "reasonably related" to the claims made in the EEOC complaint. *See Littlejohn*, 795 F.3d at 322. Despite filing the EEOC complaint prior to her formal termination, the conduct that Plaintiff complained of appears to "fall within the scope of the EEOC investigation which can reasonably be expected to grow out of the charge that was made." *Id.* (quoting *Deravin*, 335 F.3d at 200–01). Accordingly, Defendants' argument that the Notice is invalid fails.

Defendants also argue that Plaintiff's Complaint was not timely, "as it was filed twenty-eight (28) days after expiration of the 90 day period after the issuance of [the Notice]." Mot. at 14. "In order to be timely, a claim under Title VII . . . must be filed within 90 days of the claimant's receipt of a right-to-sue letter." *Sherlock v. Montefiore Med. Ctr.*, 84 F.3d 522, 525 (2d Cir. 1996). This deadline is "strictly enforced and cannot be extended by even one day." *Hughes v. Elmira Coll.*, 584 F. Supp. 2d 588, 589 (W.D.N.Y. 2008) (cleaned up). "[I]t may be assumed, in the absence of [a] challenge, that a notice provided by a government agency has been mailed on the date shown on the notice." *Sherlock*, 84 F.3d at 526. Further, "it is assumed that a mailed document is received three days after its mailing." *Id.* at 525. However, these presumptions are not "irrebuttable." *Id.* at 526. "If a claimant presents sworn testimony or other admissible evidence from which it could reasonably be inferred either that the notice was mailed later than its typewritten date or that it took longer than three days to reach her by mail, the initial presumption is not dispositive." *Id.*

Plaintiff's Notice is dated March 27, 2019, Resp. at 4, but in the sworn portion of her Complaint, Plaintiff states that she did not receive the Notice until April 24, 2019, Compl. at 4. Plaintiff also provides a photocopy of an envelope that ostensibly carried the Notice, which is stamped as mailed on April 18, 2019. Resp. at 7. While the date of receipt, rather than the date the mail was sent, is dispositive, *see Sherlock*, 84 F.3d at 525, the Court finds that the date stamped on the envelope lends credence to Plaintiff's contention that the Notice was mailed later than the date shown on the Notice itself. At this stage, the Court finds that Plaintiff has presented sufficient evidence "from which it could reasonably be inferred . . . that the [N]otice was mailed later than its typewritten date [and] that it took longer than three days to reach her by mail." *Id.* at 526. Because Plaintiff filed the Complaint on July 23, 2019, within ninety (90) days of her receipt of the Notice, Defendants' argument that the Complaint was untimely fails.

Accordingly, the Court rejects Defendants' exhaustion and timeliness arguments.

**B.  Election-of-Remedies Doctrine**

Next, Defendants argue that the election-of-remedies doctrine precludes the Court from hearing Plaintiff's claims. Mot. at 15–20. The Court finds that the doctrine imposes no such barrier.

Pursuant to New York Executive Law Section 297(9), "once a complainant elects the administrative forum by filing a complaint with the NYSDHR, a subsequent judicial action on the same complaint is generally barred." *Johnson v. County of Nassau*, 411 F. Supp. 2d 171, 184 (E.D.N.Y. 2006); N.Y. Exec. Law § 297(9) ("Any person claiming to be aggrieved by an unlawful discriminatory practice shall have a cause of action in any court of appropriate jurisdiction . . . unless such person had filed a complaint hereunder or with any local commission on human rights."). "The election-of-remedies bar is not limited to the precise claims brought in the administrative proceeding, but extends to all claims arising out of the same events."

*Wiercinski v. Mangia 57, Inc.*, No. 09-CV-4413, 2010 WL 2681168, at *2 (E.D.N.Y. July 2, 2010). However, "where the NYSDHR has dismissed a 'complaint on the grounds of administrative convenience . . . such person shall maintain all rights to bring suit as if no complaint had been filed with the [NYSDHR]." *Guerrero Toro v. NorthStar Demolition & Remediation*, 366 F. Supp. 3d 449, 475 (W.D.N.Y. 2019) (emphasis omitted) (quoting N.Y. Exec. Law § 297(9)). Section 297(9) states that "[a]t any time prior to a hearing before a hearing examiner, a person who has a complaint pending at the [NYSDHR] may request that the [NYSDHR] dismiss the complaint and annul his or her election of remedies so that the . . . claim may be pursued in court, and the [NYSDHR] may, upon such request, dismiss the complaint on the grounds that such person's election of an administrative remedy is annulled."

First, Defendants argue that the Court should grant their Motion because Plaintiff filed a NYSDHR complaint, and Section 297(9) precludes Plaintiff from bringing suit in federal court on the same claims. Mot. at 15–16. However, Defendants concede that Plaintiff's NYSDHR complaint was "dismissed for administrative convenience." *Id.* at 16. Drawing all inferences in favor of Plaintiff, the Court assumes that the case was dismissed before a hearing took place. *See* Resp. at 1–2 ("NYSDHR had full intention of conducting a public hearing . . . . Plaintiff opted to proceed in federal court"). Accordingly, Plaintiff retains "all rights to bring suit as if no complaint had been filed with the [NYSDHR]." *Guerrero Toro*, 366 F. Supp. 3d at 475 (emphasis omitted) (quoting N.Y. Exec. Law § 297(9)).

Defendants also contend that because Plaintiff filed the Complaint *before* her NYSDHR case was administratively dismissed, the election-of-remedies doctrine nevertheless bars the Court from considering her claims. Mot. at 17. However, even when a NYSDHR complaint is still pending at the time a federal action is filed, the Court may still exercise its jurisdiction to

adjudicate the claims arising from that administrative complaint. *See Guerrero Toro*, 366 F.

Supp. 3d at 476 ("[S]imply because the [] NYSDHR complaint was still pending at the time the

instant action was commenced does not strip this Court of its jurisdiction to adjudicate any

NYSHRL claims arising from that administrative complaint."); *see also Whidbee v. Garzarelli*

*Food Specialties, Inc.*, 223 F.3d 62, 76 (2d Cir. 2000) (allowing the plaintiffs' NYSDHR claims

to proceed in federal court, despite the plaintiffs filing the judicial action before their NYSDHR

claims were dismissed for administrative convenience). Accordingly, the Court finds that the

election-of-remedies doctrine does not bar the Court from hearing Plaintiff's claims.

### C.  Plaintiff's Title VII Claims

Construed liberally, Plaintiff alleges disparate treatment, a hostile work environment, and

retaliation by Saratoga Center in violation of Title VII. Defendants argue that the Complaint

"does not state a cognizable cause of action against Saratoga [Center] under any theory." Mot. at

20.

#### 1.  *Disparate Treatment*

Plaintiff's disparate treatment claim under Title VII is subject to the burden-shifting

evidentiary framework set forth in *McDonell Douglas Corp. v. Green*, 411 U.S. 792, 802–04

(1973). *Littlejohn*, 795 F.3d at 312. At the pleading stage, all that is required is that "the

allegations in the complaint give plausible support to the reduced prima facie requirements." *Id.*

Plaintiff's claim survives the motion for judgment on the pleadings if she alleges "(1) that she is

a member of a protected class; (2) that she was qualified for employment in the position; (3) that

she suffered an adverse employment action; and, in addition, has (4) some minimal evidence

suggesting an inference that the employer acted with discriminatory motivation." *Id.* at 307.

Defendants' Motion does not challenge the first three prima facie elements, instead focusing exclusively on the fourth. They argue that "Plaintiff does not demonstrate any inference of discrimination" in the Complaint. Mot. at 23. The Court disagrees.

The burden to prove an inference of discrimination is exceedingly low. *See Zimmermann v. Assocs. First Capital Corp.*, 251 F.3d 376, 381 (2d Cir. 2001). However, courts in this Circuit have held that, at a minimum, a plaintiff must allege an inference of discrimination by "anyone conceivably involved in the decision" to impose the adverse employment action. *Rubert v. King*, No. 19-CV-2781, 2020 WL 5751513, at *7 (S.D.N.Y. Sept. 25, 2020); *see also Campbell v. Alliance Nat. Inc.*, 107 F. Supp. 2d 234, 247 (S.D.N.Y. 2000) (finding no inference of discrimination because a racist comment to the plaintiff "did not relate to the decision to terminate [the plaintiff's] employment and was made by a non-decisionmaker"), *Wesley-Dickson v. Warwick Valley Cent. Sch. Dist.*, 973 F. Supp. 2d 386, 399 (S.D.N.Y. 2013) (finding no inference of discrimination because "there is no evidence that the [alleged racist] comments were related to the decisionmaking process").

As alleged in her Complaint, Plaintiff states two claims of disparate treatment. The first was when she was no longer allowed to work on B1, one of the Facility's units, for about two weeks. *See* Compl. at 12.[5] Plaintiff asserts that a resident had made a complaint and Alyssa Stealy decided it was about Plaintiff. *Id.* She subsequently had Plaintiff "removed." *Id.* Here, Plaintiff provides "some minimal evidence" that the Facility acted with discriminatory motivation. At the outset, an investigation into the resident's complaint found that Plaintiff was

---

[5] Defendants do not challenge that Plaintiff's two-week interruption from working on B1 is an "adverse employment action" under Title VII. For the purpose of deciding this Motion only, the Court assumes that it is. *See Muldrow v. City of St. Louis*, 601 U.S. 346, 355, 359 (2024) (holding that Title VII plaintiffs need to show only "*some* harm respecting an identifiable term or condition of employment" that left them "worse off").

not working when the resident made the complaint. *Id.* Further, Plaintiff alleges several instances where Stealy has exhibited racial animus toward Plaintiff. According to Plaintiff, Stealy never took issue when Olpaka, a white employee, had to correct Stealy's input of medication orders, but always objected when Plaintiff did the same. Compl. at 11. Plaintiff avers that Stealy also made baseless comments about Plaintiff and sabotaged Plaintiff and the night staff, all of whom were Black. *Id.* Further, Plaintiff recounts an interaction between Millington, Olpaka, and Plaintiff, where Olpaka said that Stealy urged Zastawny to fire "those people." *Id.* at 12–13. These allegations are sufficient to satisfy Plaintiff's burden of "minimal evidence suggesting an inference that the employer acted with discriminatory motivation." *Littlejohn*, 795 F.3d at 307. Moreover, because Plaintiff alleges that Stealy was responsible for Plaintiff's removal from B1, Compl. at 12, Stealy is considered a "decisionmaker."

The second instance of disparate treatment alleged in the Complaint was when Saratoga Center terminated Plaintiff's employment from the Facility. The Court finds that Plaintiff also satisfies her burden of proving an inference of discrimination here. While Plaintiff makes no allegations that Zastawny personally exhibited racial animus against her, it is plausible that Stealy was "conceivably involved" in the decision to terminate Plaintiff. *Rubert*, 2020 WL 5751513, at *7. Plaintiff alleges that Stealy had authority to remove Plaintiff from B1, Compl. at 12, suggesting that Stealy wielded some degree of decision-making power at the Facility. Further, Plaintiff alleges that Stealy "colluded" with Zastawny to "sabotage" Plaintiff, because of their "friendship and outside ties." *Id.* at 17. At this stage, such allegations are sufficient to satisfy Plaintiff's burden to prove an inference of discrimination.

Accordingly, Defendants' motion for judgment of the pleadings with respect to Plaintiff's Title VII claim for disparate treatment is denied.

### 2. *Hostile Work Environment*

To state a claim for a hostile work environment in violation for Title VII, "a plaintiff must show that 'the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Littlejohn*, 795 F.3d at 320–21 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). Further, the hostile work environment must have been "caused by animus towards her as a result of [her] membership in a protected class." *Kirkland-Hudson v. Mount Vernon City Sch. Dist.*, 665 F. Supp. 3d 412, 465 (S.D.N.Y. 2023) (quoting *Bermudez v. City of New York*, 783 F. Supp. 2d 560, 573 (S.D.N.Y. 2011)). When considering a hostile work environment claim, courts will review the totality of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Littlejohn*, 795 F.3d at 321 (quoting *Harris*, 510 U.S. at 23).

To survive at the pleading stage, a plaintiff "need only plead facts sufficient to support the conclusion that she was faced with 'harassment . . . of such quality and quantity that a reasonable employee would find the conditions of her employment altered for the worse.'" *Patane v. Clark*, 508 F.3d 106, 113 (2d Cir. 2007) (quoting *Terry v. Ashcroft*, 336 F.3d 128, 148 (2d Cir. 2003)).

Defendants argue that their Motion should be granted with respect to Plaintiff's hostile work environment claim because Plaintiff "cannot assert factual allegations—only conclusory conclusions—to show Plaintiff was treated 'less well' because of her race or color." Mot. at 27. Defendants also argue that "[c]ourts in this Circuit have consistently rejected hostile work

environment claims where the allegations were far more severe or pervasive than the ones made by Plaintiff." *Id.* at 26.

With respect to the potential contributions to a hostile work environment by Heroth and Wiley, there lacks causation between their actions and animus for Plaintiff's race. While Heroth mistakenly accused Plaintiff of violating the Facility's social media policies, this mistake appears to have been motivated by Heroth's nondiscriminatory assumption that Plaintiff made the post because Plaintiff was recently in her office, and because the person who made the post had the same first name as Plaintiff. Compl. at 8. Further, while Wiley referred to Plaintiff as "that girl" after a disagreement over the appropriate medical routine, Compl. at 9, the Court cannot find that this comment, on its own, was motivated by racial animus.

Although Stealy's behavior gives rise to an inference of discrimination with respect to Plaintiff's disparate treatment claims, these allegations are not sufficient to plead a hostile work environment. The Court cannot conclude that Plaintiff faced "harassment . . . of such quality and quantity that a reasonable employee would find the conditions of her employment altered for the worse." *Patane*, 508 F.3d at 113.

For one, the majority of Plaintiff's allegations are too conclusory. Particularly, Plaintiff's claims that Stealy "took issue with" her when Plaintiff fixed Stealy's input of medication orders, Compl. at 11, made "baseless comments" and attempted to "sabotage" her, *id.*, and "egregiously harassed" her, *id.* at 17, are insufficient to "raise a reasonable expectation that discovery will reveal evidence of [alleged misconduct]." *Twombly*, 550 U.S. at 556.

To the extent that Plaintiff presents non-conclusory allegations in support of her hostile work environment claim, they are too weak. Plaintiff asserts that Stealy urged Zastawny to fire Plaintiff, Compl. at 13, and that Stealy had Plaintiff removed from B1 for about two weeks, *id.* at

12. Plaintiff also states that Stealy called her "useless." *Id.* These allegations are insufficient to state a claim upon which relief may be granted. *See, e.g.*, *Littlejohn*, F.3d at 321 (finding no hostile work environment despite the plaintiff's supervisor making negative statements to the plaintiff, showing impatience and using a harsh tone, distancing herself from the plaintiff, declining to meet with the plaintiff, requiring the plaintiff to do extra work, replacing the plaintiff at meetings, wrongfully reprimanding the plaintiff, increasing the plaintiff's reporting schedule, and making sarcastic comments); *Fleming v. MaxMara USA, Inc.*, 371 F. App'x 115, 119 (2d Cir. 2010) (finding no hostile work environment despite the defendants wrongly excluding the plaintiff from meetings, excessively criticizing her work, refusing to answer work-related questions, arbitrarily imposing duties outside of her responsibilities, throwing books, and sending rude emails to her).

Without more, the Complaint does not allege facts that allow the Court to find the existence of a hostile work environment. Defendants' Motion is granted with respect to Plaintiff's hostile work environment claim.

### 3. Retaliation

Like Plaintiff's disparate treatment claim, Plaintiff's retaliation claim under Title VII is subject to the burden-shifting evidentiary framework set forth in *McDonell Douglas*. *Kirkland-Hudson*, 665 F. Supp. 3d at 458. Similar to a disparate treatment claim, "the allegations [in the Complaint] need only give plausible support to the reduced prima facie requirements." *Id.* (cleaned up). A plaintiff's claim can survive a motion for judgment on the pleadings if she alleges that "(1) she was engaged in an activity protected under Title VII; (2) her employer was aware of her participation in the protected activity; (3) the employer took adverse action against her; and (4) a causal connection existed between the protected activity and the adverse action." *Id.* at 459 (cleaned up). "[A] plaintiff engages in 'protected activity' when she (1) opposes

employment practices prohibited under Title VII; (2) makes a charge of discrimination; or (3) participates in an investigation, proceeding or hearing arising under Title VII." *Jacobs v. Hudson Valley Family Physicians, PLLC*, 725 F. Supp. 3d 235, 247 (N.D.N.Y. 2024) (quoting *Davis v. NYS Dept. of Corr. Attica Corr. Facility*, 110 F. Supp. 3d 458, 462 (W.D.N.Y. 2015)).

In their Motion, Defendants argue that "Plaintiff did not allege that she engaged in any protected activity under Title VII." Mot. at 27. Indeed, Plaintiff alleges in the Complaint that she was "terminated for participating in a protected activity, which was making [D]epartment of [H]ealth reports." Compl. at 19. Making a report to the Department of Health is not a "protected activity" under Title VII. *See D'Antonio v. Little Flower Children & Family Servs. of New York*, No. 17-CV-1221, 2018 WL 1385897, at *6 (E.D.N.Y. Mar. 19, 2018) ("Title VII . . . seek[s] to prevent discrimination on the basis of personal characteristics"). The Complaint is devoid of any other allegations that Plaintiff suffered an adverse employment action because she opposed any unlawful employment practices under Title VII. Accordingly, Defendants' Motion is granted with respect to Plaintiff's claim of retaliation in violation of Title VII.

### D. Plaintiff's State Law Claims

Defendants argue that the Court should decline to exercise supplemental jurisdiction over Plaintiff's claims under Section 740 and Section 741. Mot. at 30–31. Further, with respect to Plaintiff's claim under Section 740, Defendants argue that Plaintiff does not state a cause of action. *Id.* at 28–30.

#### 1. Supplemental Jurisdiction

Defendants contend that the Court should decline to exercise supplemental jurisdiction over Plaintiff's state law claims because the Court "lacks subject matter jurisdiction to adjudicate Plaintiff's federal claims, and declining jurisdiction to any state-law claims would not disserve judicial economy, convenience, or fairness." *Id.* at 31. However, because Plaintiff's disparate

treatment claim under Title VII may proceed, the Court will retain supplemental jurisdiction over Plaintiff's state law claims. *See, e.g.*, *Hettler v. Entergy Enters., Inc.*, 15 F. Supp. 3d 447, 453 (S.D.N.Y. 2014).

### 2. Section 740 Claim

Before evaluating the merits of Plaintiff's Section 740 claim, the Court must first decide whether to consider the version of Section 740 that existed when Plaintiff filed the Complaint, or the amended version of the statute. In January 2022, Section 740 was amended to "alter the definition of retaliation and to expand the scope of the prohibition." *Pierce v. Better Holdco, Inc.*, No. 22-CV-4748, 2023 WL 6386920, at *4 (S.D.N.Y. Sept. 29, 2023). "Under the earlier version of the statute, a plaintiff was required to show that the policy or practice of the employer violated a law, rule, or regulation *and* that the alleged violation presented a substantial and specific danger to the public health or safety." *Rackley v. Constellis, LLC*, No. 22-CV-4066, 2024 WL 3498718, at *26 (S.D.N.Y. June 17, 2024). "Under the most recent amendment, however, a plaintiff need only show that they *reasonably believe* that the policy or practice of the employer violated the law *or* that they *reasonably believe* that the policy or practice poses a substantial and specific danger to public health or safety." *Id.*

"The Second Circuit has not yet ruled on retroactive application of the 2021 amendments, and the few courts that have considered the issue have been divided." *Id.*; *compare Callahan v. HSBC Sec. (USA) Inc.*, 723 F. Supp. 3d 315, 326 (S.D.N.Y. 2024) (applying the amended version of Section 740 retroactively) *with Zennamo v. County of Oneida*, No. 21-CV-840, 2022 WL 4328346, at *10 (N.D.N.Y. Sept. 19, 2022) (applying the earlier version of Section 740 to a claim that pre-dated the 2021 amendments). This Court agrees with the *Callahan* court that "the legislative history strongly supports the view that the 2021 amendments had a remedial purpose intended to correct the restrictive nature of the prior statutory requirements." *Callahan*, 723 F.

Supp. 3d at 326; *see also Rackley*, 2024 WL 3498718 at *26 (applying the amended version of Section 740 retroactively); *Zhang v. Centene Mgmt. Co., LLC*, No. 21-CV-5313, 2023 WL 2969309, at *16 (E.D.N.Y. Feb. 2, 2023) (same). Accordingly, although the events alleged by Plaintiff took place before the amendment of Section 740, the Court will apply the current version of the law.

"To establish a claim under the amended version of Section 740, a plaintiff must first allege that she disclosed or threatened to disclose to a supervisor [or to a public body] an activity, policy, or practice of the employer that the employee at least reasonably believed was illegal or posed a substantial specific danger to public health or safety." *Rackley*, 2024 WL 3498718 at *27. "At the pleadings stage of the case, the complaint 'need not specify the actual law, rule or regulation violated.'" *Tonra v. Kadmon Holdings, Inc.*, 405 F. Supp. 3d 576, 586 (S.D.N.Y. 2019) (quoting *Webb-Weber v. Cmty. Action for Human Servs., Inc.*, 15 N.E.3d 1172, 1174 (N.Y. 2014). "The plaintiff must then point to a retaliatory adverse action taken by the employer in response to that complaint." *Rackley*, 2024 WL 3498718 at *27 (quoting *Thacker v. HSBC Bank USA, N.A.*, No. 22-CV-7120, 2023 WL 3061336, at *6 (S.D.N.Y. Apr. 24, 2023)).

Here, Defendants argue that Plaintiff's claim is "not actionable under [Section] 740" because the Facility's "alleged misconduct . . . did not rise to the level of danger to public health and safety required by statute." Mot. at 30. But under the amended version of Section 740, Plaintiff need only allege that she disclosed misconduct that she *reasonably believed* was illegal. Plaintiff's claim survives Defendants' Motion.

First, Plaintiff sufficiently alleges that she disclosed actions by the Facility to the Department of Health that she reasonably believed were illegal. For one, Plaintiff states that she filed a report with the Department of Health on October 29, 2018, after a resident went missing

for over two hours. Compl. at 10. She states that the Facility failed to take a count of the residents in the building or check the doors around the Facility. *Id.* at 9 According to Plaintiff, none of the protocols were followed. *Id.* Construed liberally, the Court interprets the Complaint to allege that by failing to follow protocol after a patient went missing, Plaintiff reasonably believed that the Facility was violating a law, rule, or regulation.

Plaintiff states that she filed another report with the Department of Health after she suspected that Millington had improperly "logged into the system" from home and "discontinued the narcotic that was increased." *Id.* at 15.[6] Here too, the Court finds that Plaintiff reasonably believed that the Facility's actions violated a law, rule, or regulation. Plaintiff alleges that in a conversation with the director of nursing, Millington's actions had to be reported because nurses are mandated reporters. *Id.* Plaintiff also notes that as a result of her complaints, the New York Attorney General conducted an "intense" investigation and ultimately closed the Facility due to many "violations." Resp. at 2.

Further, Plaintiff points to her termination as a retaliatory adverse action taken by the Facility in response to her reports. While Plaintiff's October 29, 2018 report to the Department of Health was anonymous, Plaintiff was informed that her name may have been disclosed to employees at the Facility over the course of the investigation. Compl. at 10. Plaintiff also told the Facility of her suspicions about Millington's improper actions because of their duty as mandated reporters, *id.* at 15, making it likely that the Facility knew of Plaintiff's second report to the Department of Health. Given the Facility's potential knowledge of Plaintiff's reports, and the

---

[6] It is not clear from the Complaint whether Plaintiff's report to the Department of Health pertained to her suspicions about Millington's alleged improper actions, or something else. However, construing the Complaint liberally, the Court assumes that the report was made due to her concerns about Millington.

fact that both reports were made less than six months before Plaintiff was terminated, it is plausible that Saratoga Center terminated Plaintiff because of her complaints to the Department of Health. Defendants' motion for judgment on the pleadings with respect to Plaintiff's Section 740 claim is denied.

### 3. Section 741 Claim

In their Motion, Defendants argue only that the Court should decline to exercise jurisdiction over Plaintiff's Section 741 claim. They do not argue its merits. Because the Court retains jurisdiction over Plaintiff's state law claims, this claim also survives.

## V.    LEAVE TO AMEND

In light of her pro se status, the Court will afford Plaintiff the opportunity to file an amended complaint. *See Gomez v. USAA Fed. Sav. Bank*, 171 F.3d 794, 795–96 (2d Cir. 1999). If Plaintiff chooses to file an amended complaint, she must set forth a short and plain statement of the facts on which she relies to support her claims. Plaintiff is advised that any amended complaint will completely replace the Complaint in this action, and that no portion of the Complaint shall be incorporated into her amended complaint by reference. If Plaintiff intends to file an amended complaint, she must do so within thirty (30) days of this Order.

## VI.    CONCLUSION

Accordingly, it is hereby:

**ORDERED**, that Defendants' Motion, Dkt. No. 61, is **GRANTED in part**, with respect to Plaintiff's hostile work environment claim and retaliation claim under Title VII; and it is further

**ORDERED**, that Defendants' Motion, Dkt. No. 61, is **DENIED in part**, with respect to Plaintiff's disparate treatment claim under Title VII and her state law claims under Section 740 and Section 741; and it is further

**ORDERED**, that Plaintiff's hostile work environment claim and retaliation claim under Title VII are **DISMISSED without prejudice**; and it is further

**ORDERED**, that if Plaintiff wishes to file an amended complaint, she must file it within thirty (30) days of the filing day of this Memorandum-Decision and Order. Plaintiff is reminded that any amended complaint will completely replace the Complaint in this action, and that no portion of the Complaint shall be incorporated into her amended complaint by reference; and it is further

**ORDERED**, that the Clerk serve a copy of this Memorandum-Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

DATED:        January 8, 2025
              Albany, New York

LAWRENCE E. KAHN
United States District Judge